**Marty SCHWARTZ, et al., Plaintiffs,**

v.

**THE UPPER DECK COMPANY, Defendant.**

**No. Civ. 96–3408–B (AJB).**

United States District Court,
S.D. California.

March 11, 1997.

William Lerach, Patrick Coughlin, Alan Marsfield, San Diego, CA, for plaintiffs.

Jon Logan Edwards, Liesel Brand Stevens, San Francisco, CA, for defendant.

## ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

BREWSTER, District Judge.

## I. CASE TYPE AND JURISDICTION

This is a civil RICO class action against the manufacturer and marketer of packaged sports and entertainment trading cards for allegedly organizing and participating in a pattern of racketeering activity through the distribution of its trading cards. This Court has jurisdiction based on 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). The defendant filed a 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted.

## II. BACKGROUND

### A. The Parties

Defendant, The Upper Deck Company (Upper Deck) is the third largest manufacturer and marketer of sports and entertainment trading cards in the United States with its principal corporate offices in Carlsbad, California. Founded in 1988, Upper Deck is a privately held company that describes itself as the "leading manufacturer to bring involvement to the trading card business through its high quality, full-color baseball, basketball, football, hockey, motor spoils and animation-style cards for spoils fans and collectors." In 1992, Upper Deck's revenues from the sale of its trading cards exceeded $80 million.

The plaintiffs propose to bring this action on behalf of those similarly situated who have purchased Upper Deck's trading cards. The representatives of the proposed class include: (1) Marty Schwartz from Port Washington, New York; (2) Lance Kuba from Woodbury, New York; (3) Bruce Laxer from North Caldwell, New Jersey; and (4) Patricia Sullivan from New Hyde Park, New York (suing on her own behalf and as guardian *ad litem* for her son).

### B. The Alleged "Gambling Activity"

The complaint alleges that the packaging and distribution of Upper Deck's sports and entertainment cards constitutes a gambling activity. Upper Deck manufactures cards, packages them in a sealed wrapping, and distributes them to retailers across the country. Each package contains a pre-set number of cards; however, the package does not disclose or describe the specific cards contained therein. Instead, on the back of the package, in very small print, it states that the package "contains a random assortment" of numbered trading cards (regarding one specific sport or subject such as football or basketball). The package also provides that "randomly inserted into these specially marked packages are the following insert cards." The label then lists various types of cards and the odds of receiving one of the cards in that particular package.[1] Plaintiffs allege that the random insertion of cards manufactured in limited quantity, or "chase" cards,[2] constitutes illegal gambling under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1964.

## III. DISCUSSION

### A. Standard of Law: 12(b)(6) Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of the claims in the complaint. A claim can only be dismissed with prejudice if "it appears beyond doubt that the plaintiff can prove no set of facts in

---

**1.** Exhibit A of the complaint is a package for football trading cards. That label states that the package may include: "gold version" (1:7); "Holofame Collection" (1:24); "Dan Marino Record Breaker" (1:81); "Joe Montana Tribute" (1:95); "Dan Marino Record Breaker Autographed" (1:433).

**2.** Plaintiffs refer to the cards as "chase cards" because collectors allegedly "chase" these limited edition trading cards.

support of his claim which would entitle him to relief" *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). This court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, and must construe the complaint in the light most favorable to plaintiff *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir. 1986); *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995). The court need not, however, accept every allegation in the complaint as true; rather, the court "will examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff." *Holden v. Hagopian,* 978 F.2d 1115, 1121 (9th Cir.1992) (citation omitted).

### B. Governing Law: Civil RICO

■ Congress enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO") with the specific intent to "thwart the organized criminal invasion and acquisition of legitimate business enterprises and property." *Oscar v. University Students Co-operative Assn.,* 965 F.2d 783, 786 (9th Cir.), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). Section 1964(c) provides that:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fees.

18 U.S.C. § 1964(c). However, federal courts have established that RICO was "intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff." *Oscar,* 965 F.2d at 786.

The substantive provision of RICO, § 1962, describes the prohibited activities and provides for three different causes of action. Section 1962(a) provides that:

> [it] shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeer-

ing activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Section 1962(b) provides a cause of action for acquiring or maintaining an interest in or control of any enterprise engaged in interstate commerce using funds from racketeering activity. Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or tie activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs a pattern of racketeering activity[.]

18 U.S.C. § 1962(c). Finally, section 1962(d) provides a cause of action for conspiring to violate any of the provisions in subsections (a), (b), or (c). Plaintiffs allege causes of action under subsections (a), (b), (c) and (d) of § 1962.

■ To state a cause of action under RICO, plaintiffs must establish that defendant engaged in a pattern of racketeering activity which has injured them. *See Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). RICO, in pertinent part, defines "racketeering activity," as "any act or threat involving ... gambling ... which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A).

### C. Choice of Law

Since RICO requires that the gambling activity be "chargeable under state law," tile law of the state where the gambling took place must be applied. State criminal law only applies to illegal acts which take place within that state's borders. For purposes of this case, the alleged gambling took place in New York and New Jersey because that is where plaintiffs paid money for the trading cards.[3]

---

**3.** This may pose difficulties to plaintiffs later on      if they attempt to certify a class because each

Choice of law is important because there are three issues which must be decided under state law: (1) whether plaintiffs have standing to recover gambling losses; (2) whether the manufacture and sale of 'chase' cards constitutes illegal gambling; and (3) if so, whether this activity is punishable by more than one year in prison.

### D. Standing to Recover Gambling Losses

Upper Deck argues that plaintiffs lack standing to bring this suit because they have not sustained an injury to support their RICO claim. The law is clear that the plaintiffs cannot recover for their disappointment or other feelings experienced in not obtaining 'chase' cards. *See Oscar v. University Students Co-operative Assn.*, 965 F.2d 783 (9th Cir.) (holding that a neighbor renting an apartment across from a building where the tenants sold drugs lacked standing because annoyance caused by the drug related activities did not constitute an "injury" for purposes of RICO), *cert. denied*, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). Likewise, plaintiffs cannot recover for a developed "habit" of buying trading cards to obtain the "chase cards," *see Allman v. Philip Morris, Inc.*, 865 F.Supp. 665, 667–68 (S.D.Cal.1994), or speculative "lost profits" in the secondary market. *See Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303 (9th Cir.1992), *cert denied*, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). Upper Deck also argues that plaintiffs cannot recover the amount they paid for the packages of cards because the cards they actually received are the fair equivalent of what they paid. *See Heinold v. Perlstein,* 651 F.Supp. 1410, 1412 (E.D.Pa.1987) (holding that where seller misrepresented the value of a diamond ring, and buyer purchased the ring and later discovered it was worth less than represented, buyer did not sustain a RICO injury because he did not pay more than the fair market value for the ring).

At oral argument, plaintiffs' counsel stated that people buy packages of Upper Deck trading cards for the chance of getting a 'chase' card. Upper Deck argues that if

plaintiffs amend their complaint to allege that they purchased packages of trading cards for the 'chance,' they lack standing because they cannot allege an injury to their property recoverable under RICO. Gambling losses, defendant contends, are not recoverable under RICO. Plaintiffs respond that both New York and New Jersey allow recovery of gambling losses.

■ New York General Obligations Law Chapter 24–A § 5–423 provides:

> Any person who shall purchase any share, interest, ticket ... or [ ] any portion of any lottery, may sue for and recover double the sum of money, and double the value of goods or things in action, which he may have paid or delivered in consideration of such purchases, with double costs of suit.

New Jersey Statutes Annotated Title 2A Chapter 40 § 2 provides:

> Whoever pays, delivers or deposits any money, property or thing in action upon the event of any wager or bet prohibited by this chapter or by any law of this state, may sue for and recover the same of the winner, or person to whom tile same shall be paid or delivered[.]

Under both of these statutes, plaintiffs have standing to sue to recover their gambling losses.

■ Defendant also argues that plaintiffs cannot recover their gambling losses because they participated in the alleged gambling activity, and are therefore barred from recovering their losses under the doctrine of *in pari delicto*. Federal courts which have addressed the issue have held that the *in pari delicto* defense is not available in RICO cases. *See In re National Mortgage Equity Securities Litigation,* 636 F.Supp. 1138 (C.D.Cal.1986) (in a RICO case, *in pari delicto* is not a defense because of the public policy of encouraging competition); *Bieter v. Blomquist,* 848 F.Supp. 1446 (D.Minn.1994) (the affirmative defenses of unclean hands and *in pari delicto* are not available to a RICO cause of action).

Finally, defendant argues that gambling losses cannot be recovered because

---

state's criminal law differs. For instance, gambling is legal in Nevada, so no Nevada residents could be class members. Moreover, state law

varies on whether gambling losses are recoverable.

it would create an incentive for trading card purchasers to engage in more of the activity that plaintiffs appear to be complaining of Plaintiffs could run out and buy more cards hoping to reap huge profits in the secondary market. If they fail, they would be guaranteed a return under RICO of three times their purchase price.

Def. Memo P & A's, p. 12. Defendant misconstrues the purpose behind allowing recovery of gambling losses. The purpose of RICO is not to harm or reward the gamblers, but to shut-down the people or companies running the illegal gambling operations. If recovery of gambling losses were barred, then illegal gambling operations would be immune from civil liability. The only people directly injured by a bookmaking scheme are the people who lose money gambling with the bookie. If they are barred from recovering from the bookie, he is in effect civilly immune. The whole point of civil RICO is to provide a civil means of attacking racketeering activity. Civil RICO is intended to have the exact effect that defendant complains of. People who gamble and lose will seek to recover three times their losses from the organization running the illegal gambling scheme. This will ensure that the gambling operation's future is short-lived. Assuming people behave as defendant envisions, there may well be a spurt of excessive purchasing of chances to win 'chase' cards, but it will be followed shortly by the cessation of the gambling operation as these people attempt to recover treble damages from defendant.

Given that New York and New Jersey law allow recovery of gambling losses, plaintiffs have standing to sue under § 1962(c) of RICO to recover the amount they have spent attempting to buy 'chase' cards. Gambling losses, however, are not recoverable under §§ 1962(a) & (b) because these provisions require injury from the use of racketeering proceeds that is distinct from any injury caused by the underlying racketeering activity. *See* Discussion, *infra*, Part III.G.

## E. Whether Upper Deck's Activities Constitute an Illegal Lottery

### 1. New York Gambling Laws

Plaintiffs argue that Upper Deck's activities constitute an illegal lottery in the state of New York. Illegal lotteries are governed by Article 225 of the New York Penal Code. Section 225.00(10), defines an illegal lottery as:

> an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value.

Plaintiffs argue that Upper Deck's distribution of "chase cards" satisfies the three elements of a lottery: chance, consideration, and a prize. The consideration is the purchase price of a package of cards. The chance is the probability that a "chase card" might be contained in one of the packages. The prize is the chase card itself with an immediately ascertainable value in the secondary market. There is no dispute as to the chance and prize elements. Defendant, however, contends that people pay consideration for the cards they actually receive, not for the 'chance' of receiving a chase card. Plaintiffs respond that people only buy the packages of cards for the chance of receiving a 'chase' card.

Courts in New York have found similar schemes to be illegal gambling. In *People v. Miller*, 271 N.Y. 44, 2 N.E.2d 38 (1936), theater patrons who purchased movie tickets would also receive a chance to win a cash prize. Before the movie, the theater owners would spin a wheel on stage to determine which ticket holder won the prize. The New York Court of Appeals held that this constitutes an illegal lottery because the purchase price was paid, in pail, for the right to see the movie, and in part, for the chance of winning the prize. *Id.* at 47–48, 2 N.E.2d 38: *see People v. Runge*, 3 N.Y.Cr.R. 85 (sale of a piece of chewing gum for a penny which secured a chance to draw a prize constitutes

a lottery). In *People v. Lavin,* 179 N.Y. 164, 71 N.E. 753 (1904), the Appellate Division of the New York Supreme Court held that a scheme where 100 cigar bands could be sent in with a guess as to the number of cigars which would be taxed during a specific month, where those with the closest guesses would receive cash prizes of up to $5,000, was an illegal lottery. The consideration was the money paid to buy the cigars in order to obtain the cigar bands that made one eligible to participate in the lottery. This consideration was paid, in part, for the cigars, and in pail, for the chance at winning the cash prize.[4] In *Solon v. Meuer,* 141 Misc.2d 993, 539 N.Y.S.2d 241 (1987), the Civil Court of the City of New York held that a "pyramid game" was an illegal lottery because the players paid money (consideration) for the possibility that they would advance to the head of the pyramid (chance because it depended on whether others would "buy into" the scheme) and receive $20,000 (prize). The Court also held that plaintiff was entitled to recover the money she paid to participate in the scheme.

### 2. New Jersey Gambling Laws

New Jersey defines an illegal lottery as:

[A]n unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value.

N.J. Stat. Ann. Title 2C Chapter 37 § 1. The New Jersey definition of illegal lottery is identical to New York's definition, and has the same basic three elements of chance, consideration and prize.

There were no cases found on point in New Jersey interpreting what activities qualify as an illegal lottery. However, given that the language in the New Jersey statute is identical to that in the New York statute, it is likely that the New Jersey courts would analyze the issue in the same manner as New York courts.

### 3. Upper Deck's Activities

The three elements of illegal gambling are chance, consideration and prize. There is no dispute that a purchaser of a package of Upper Deck trading cards has a chance of receiving a 'chase' card, and that 'chase' cards constitute a valuable 'prize' because of their readily ascertainable value in the secondary market. The only dispute is over whether plaintiffs are paying *consideration* for a chance of winning the prize. Defendant argues that plaintiffs pay their consideration for the cards that they actually receive, not for the chance of winning a 'chase' card.

■ Applying New York and New Jersey law, it appears that as long as plaintiffs allege that they purchased packages of Upper Deck trading cards *at least partially* for the chance of winning a valuable chase card, then they have sufficiently alleged "racketeering activity" for purposes of RICO. Plaintiffs fail, however, to adequately allege that they paid consideration for the chance of winning 'chase' cards. The Complaint merely states that "Upper Deck's marketing of its sports and entertainment trading cards to members of the plaintiff class involves the element of consideration in that persons must purchase card packages in order to win a valuable chase card." Complaint ¶ 31. Plaintiffs' complaint must be DISMISSED with leave to amend because it does not allege that they paid money for the chance of winning 'chase' cards.

This allegation is also necessary to establish causation. Section 1964(c) provides a

---

4. These lotteries are illegal because people must pay consideration in order to have a chance to win the prize. Most modern 'sweepstakes' have a means of cost-free entry such as a mailing in a 3x5 card with the contestant's name and address in order to receive a 'chance' to win the prize. Providing a cost-free means of entry eliminates the consideration element and prevents the sweepstakes from being an illegal lottery. In this case, the only way people can have a chance to win a 'chase' card is by purchasing a package of Upper Deck trading cards. There is no cost-free means of entry.

civil action to recover treble damages for injury "by reason of a violation of" its substantive provisions. This is the causation requirement under RICO. Plaintiffs must allege that defendant's illegal lottery (i.e. the chance of winning a prize) was the reason they paid money to defendants. Thus, they must allege that their losses were caused by defendant's alleged racketeering activity.

## F. Whether Upper Deck's Activities are Punishable By More Than One Year Imprisonment

RICO requires that the alleged racketeering activity be "chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). In addition to alleging that defendant's acts are potentially chargeable as illegal gambling under New York and New Jersey law, plaintiffs must allege that, under the penalty statutes in those states, the alleged crimes are punishable by more than one year imprisonment.

After reviewing New York and New Jersey penal law, the Court notes that Upper Deck might be charged with illegal gambling activities which carry penalties of imprisonment of greater than one year.[5] Plaintiffs, however, fail to allege this. Plaintiffs' complaint must be DISMISSED with leave to amend for failure to allege that defendant's allegedly illegal gambling activities are punishable by more than one year imprisonment.

## G. Plaintiffs Do Not Satisfy the Special Standing Requirements of 18 U.S.C. §§ 1962(a) and 1962(b)

■ Upper Deck argues that §§ 1962(a) & (b) require more than general or conclusory allegations that a defendant received racketeering income and used it in a way which harmed plaintiffs. The express statutory language of §§ 1962(a) & (b) require that plaintiffs allege injury from the use of pro-

ceeds of the racketeering activity that is distinct from the predicate acts themselves. The Ninth Circuit has held that §§ 1962(a) & (b) require plaintiffs to allege violations of these sections with specificity. *See Nugget Hydroelectric, L.P. v. Pacific Gas and Electric Co.,* 981 F.2d 429, 437 (9th Cir.1992) (holding that the language "by reason of" requires plaintiff to allege facts tending to show that they were injured by use or investment of racketeering income), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993); *see also U.S. Concord v. Harris Graphics, Corp.,* 757 F.Supp. 1053, 1060 (N.D.Cal.1991) (comparing requirements under §§ 1962(a) and 1962(b)); *In re Rexplore, Inc. Securities Litigation,* 685 F.Supp. 1132, 1142 (N.D.Cal.1988) (stating "that to hold the payment of fees and commissions sufficient to state a claim under Section 1962(a) would 'involve a vast and unwarranted extension of the boundaries of civil RICO.' ").

Plaintiffs have failed to allege that defendant received racketeering income and used it in a way which harmed plaintiffs. Maintenance of the racketeering enterprise (i.e. the manufacture and sale of 'chase' cards) is the predicate act. Plaintiffs allege injury from these predicate acts which may state a cause of action under § 1962(c), but they have not alleged any injury from Upper Deck's use of its racketeering proceeds. For instance, they are not a competitor who has suffered a competitive injury because of Upper Deck's use of its alleged ill-gotten revenues. The gravamen of plaintiffs' complaint is that defendant maintains an illegal lottery scheme, and that plaintiffs have been injured by losing money in the illegal lottery. This can only be actionable under § 1962(c).

For this reason, plaintiffs' first and second causes of action for violation of 18 U.S.C.

---

**5.** Section 225.10 of the New York Penal Code provides that "[a] person is guilty of promoting gambling in the first degree when he knowingly advances or profits from unlawful gambling activity by . . . receiving, in connection with a lottery or policy scheme or enterprise . . . more than five hundred dollars in any one day of money played in such scheme or enterprise." This crime is a felony, punishable by more than one year imprisonment. In New Jersey, section 2C:37–2(b)(2) (promoting gambling) provides that a person who "[r]eceiv[es], in connection with a lottery or policy scheme or enterprise . . . more than $100.00 in any 1 day of money played in such scheme or enterprise, is guilty of a crime of the third degree." A crime in the third degree is punishable by a term of imprisonment of between three and five years. *Id.* 2C:43–6(a)(3).

§§ 1962(a) & (b) must be DISMISSED with leave to amend.

### H. Plaintiffs Meet the Separate "Person" and "Enterprise" Requirements of 18 U.S.C. § 1962(c)

■ Upper Deck argues that "a single entity cannot be both the RICO enterprise and the RICO defendant." (relying on *Rae v. Union Bank,* 725 F.2d 478, 481 (9th Cir. 1984) (noting that a RICO enterprise could not simply be the defendant in a RICO case)). Plaintiffs' complaint, however, clearly alleges that the RICO enterprise is "Upper Deck ... or alternatively, Upper Deck, its distributors, and its licensors [who] formed an association-in-fact that constituted an enterprise."[6] Section 1961(4) defines an enterprise as "any union or group of individuals associated in fact although not a legal entity." Plaintiffs' complaint satisfies the requirements under § 1961(4). *See River City Markets, Inc. v. Fleming Foods West, Inc.,* 960 F.2d 1458, 1461–62 (9th Cir.1992) (recognizing that a group of individuals or corporations, some of whom are also RICO defendants, may together constitute a RICO enterprise even though they do not incorporate or otherwise form a legal entity). The fact that Upper Deck is a RICO defendant does not prevent it from also being one member of a RICO enterprise.

### I. Plaintiffs Are Not Entitled to Equitable Relief for a Civil RICO Claim

■ Plaintiffs concede that the Ninth Circuit has held that injunctive relief is not an authorized remedy for private RICO litigants. Therefore, plaintiffs are not entitled to equitable relief in this case, and the motion to dismiss is GRANTED insofar as plaintiffs seek injunctive *relief without leave to amend.*

### IV. CONCLUSION

Plaintiffs have standing to allege a claim for violation of § 1962(c). This section pro-

hibits the conduct or participation in a racketeering activity. Racketeering activity includes gambling which is illegal under state law. *See* 18 U.S.C. § 1961(1). Under both New York and New Jersey law, an illegal lottery contains the elements of chance, consideration and prize. There is no dispute that the provision of 'chase' cards in packages of Upper Deck trading cards contains the elements of chance and prize. However, plaintiffs do not allege that they purchased the packages of cards for the chance of getting a 'chase' card, and they, therefore, have not alleged the element of consideration. In New York and New Jersey, gambling losses are recoverable.

In order to state a claim for violation of §§ 1962(a) or (b), plaintiffs must allege injury from the use of racketeering income that is separate and distinct from the injury caused by the predicate acts (i.e. the racketeering activity itself). Plaintiffs have alleged no such injury.

For the above reasons, defendant's motion to dismiss is GRANTED. Plaintiffs are given 60 days leave to file an amended complaint.

IT IS SO ORDERED.

---

6. The use of the disjunctive 'or' in this case is improper. By using 'or,' plaintiffs are not alleging either that Upper Deck is a RICO enterprise or that Upper Deck and its distributors, licensors, etc, are a RICO enterprise. Plaintiffs

must remedy this flaw when tiling their amended complaint.